Not for Publication                                                                                           (Docket Entry No. 50)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

_____
:
ANTHONY WILLIAMS,                                 :
:
            Plaintiff,                    :        Civil No. 05-5706 (RBK)
:
       v.                                           :        **OPINION**
:
JOHN NASH et al.,                                 :
:
            Defendants.                  :
_____ :

**KUGLER, United States District Judge:**

       This matter comes before the Court on the motion of Defendants Ms. De Cardi, Tushar Patel, Vincent Elias, Steve Esposito, Samir Sulayman, Derek Hamel, David Schaaff, Robert Ferretti, Glen Lawhorn, Michael Sanford, James Williams, Rashawn Robinson, Allia Lewis and John Nash for summary judgment on the Complaint of Plaintiff Anthony Williams ("Plaintiff"). Plaintiff's Complaint alleges violations of his First and Eighth Amendment rights. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

**I.     BACKGROUND**

       Plaintiff is an inmate in the custody of the federal Bureau of Prisons. During the events at issue in this case, he was incarcerated at Federal Correctional Institution Fort Dix ("FCI Fort Dix"). On February 28, 2005, Plaintiff was working for Federal Prisons Industries. While opening a seam on the cuff of a shirt, Plaintiff impaled his left thumb with a seam ripper. As

became clear later, part of the metal seam ripper broke off and remained stuck inside the wound in Plaintiff's thumb. After the accident, Plaintiff informed his supervisor he had been hurt. Later that afternoon, Plaintiff reported to the medical department and was examined by Defendant De Cardi, a nurse practitioner. Defendant De Cardi cleaned and sutured the wound. According to Plaintiff, he informed Defendant De Cardi that a piece of metal remained in his thumb. According to Defendants, Defendant De Cardi made no notes about any foreign object remaining in the thumb. No x-rays were taken.

Plaintiff continued to tell employees of the medical department that a piece of metal had broken off in his thumb, and he alleges that Defendants ignored him. On March 1, 2005, Plaintiff returned to the medical department seeking a tetanus injection, which was administered by Defendant Elias, another medical professional. According on Plaintiff, by March 4, 2005, his thumb was swollen and visibly infected. He showed his injured thumb to defendant Esposito, another medical professional, on March 4, 2005. Defendant Esposito also saw Plaintiff on March 8, March 13, March 28, April 1, and May 12, 2005.

On March 28, 2005, Plaintiff reported to the medical department and was examined by Defendant Sulayman, a doctor with FCI Fort Dix. It is undisputed that Defendant Sulayman took at least one X-ray of Plaintiff's thumb, which showed the piece of metal still lodged there. Dr. Sulayman determined that surgery would be required to remove the object, and he referred Plaintiff to be examined by one of the orthopedic surgeons who periodically visited FCI Fort Dix for orthopedic consults. (Sulayman Aff. ¶ 4.)

On April 12, 2005, Plaintiff once again reported to the medical department and saw Defendant Elias. According to Defendants, Defendant Elias arranged for an X-ray to be taken

the following day.  According to Plaintiff, Defendant Elias informed Plaintiff that surgery had not yet been scheduled because no X-rays were in Plaintiff's file.  On April 14, 2005, Plaintiff was examined by a visiting orthopedic surgeon.  The surgeon determined that the operation would need to be performed at an outside hospital.  Plaintiff was scheduled for surgery on April 27, 2005.  However, on that date, he was taken to the wrong hospital.  Finally, on May 5, 2005, an orthopedic surgeon removed the piece of metal from Plaintiff's thumb.

Plaintiff also alleges other harms stemming from his accident.  Plaintiff filed various administrative complaints concerning the medical department's treatment of his injury.  He alleges that Defendant Hamel, a correctional counselor, retaliated against him for filing complaints and complaining about his injury by giving him extra work to do, which re-injured his thumb.  He also alleges that Defendant Hamel retaliated against him for filing complaints by changing Plaintiff's status to indicate that he refused to work.  Plaintiff argues that because he was injured at work, his status should have been "medical idle," which would have continued his pay at a reduced rate while he was unable to work.  Plaintiff's change in status to "refused" meant that he lost his job.  Defendant Hamel contends that Plaintiff was not treated differently than other inmates and was placed in "refused" status because Plaintiff did not have sufficient funds in his account to cover his monthly Financial Responsibility Program repayment amount. (Hamel Aff. ¶ 9.)  Plaintiff argues he should have been paid lost-time wages under the Inmate Accident Compensation program, but Defendant Lawhorn, a manager with the Federal Prisons Industry job Plaintiff worked at, did not file the necessary paperwork to enroll Plaintiff in the program because of an intent to cover up Plaintiff's injury and retaliate against him for filing administrative grievances about it.

Plaintiff filed his original Complaint in this case on December 7, 2005 against Defendants De Cardi, Patel, Elias, Esposito, Sulayman, Hamel, Schaaff, Ferretti, Lawhorn, and Nash. He amended his complaint on June 14, 2006, to add additional retaliation and civil conspiracy claims against Defendants Lewis, Williams, Robinson, and Sanford. Defendants moved for summary judgment on October 23, 2007.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating the evidence presented by the parties, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (citation omitted).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to

4

material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

### III.    ANALYSIS

Government officials who are accused of violating a person's constitutional rights while performing discretionary functions are entitled to qualified immunity. Qualified immunity shields officials "from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This analysis is two-fold. First, the court is to assess whether the facts as alleged by the plaintiff amount to a constitutional violation. If this test is met, the court then determines whether the right is "clearly established." Saucier v. Katz, 533 U.S. 194, 200-01 (2001); Kopec v. Tate, 361 F.3d 772, 775-76 (3d Cir. 2004). In other words, before engaging in a determination of whether a right is clearly established, the court must first determine whether a constitutional violation has occurred, because "[i]f the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." Id. at 776 (quoting Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002)). Therefore, this Court must first assess the claims made by Plaintiff to determine whether they amount to a violation of his constitutional rights. Only if such a finding is made does this Court then proceed to analyze whether the right violated was clearly established.

The Court also must analyze each claim with regard to each defendant. A Bivens claim must assert some direct action and personal involvement on the part of the federal actor; mere

supervision of the individual allegedly committing the Constitutional violation is not sufficient. See, e.g., Balter v. United States, 172 F. App'x. 401, 403 (3rd Cir. Feb. 15, 2006); Richards v. Pennsylvania, 196 F. App'x. 82 (3rd Cir. 2006); Parker v. United States, 197 F. App'x. 171 (3rd Cir. 2006); see also Ruiz Rivera v. Riley, 209 F.3d 24 (1st Cir. 2000). Summary judgment will be granted to those defendants on those claims for which there is no evidence of their direct participation.

  A. Eighth Amendment

Plaintiff contends that he repeatedly insisted that metal remained in his finger but was ignored by medical staff, who dismissed his concerns. He argues that this indifference violated his Eighth Amendment rights and deprived him of necessary medical attention. Defendants argue that Plaintiff received adequate medical care and in any event deny that their actions rose to the level of a constitutional violation.

Allegations of actions amounting to malpractice will not create a Constitutional violation. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To set forth an Eighth Amendment violation based on a denial of medical care, Plaintiff must show that Defendants acted with deliberate indifference to his serious medical needs. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (citing Estelle, 429 U.S. at 104). Plaintiff must demonstrate an objectively serious medical need and subjective deliberate indifference to this need by Defendants. The Third Circuit has held that a medical need is deemed to be serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Lanzaro, 834 F.2d at 347 (quoting Pace v. Fauver, 479 F. Supp. 456, 458 (D.N.J. 1979)). Deliberate indifference can be

shown through a refusal to provide or a delay in providing medical care. Id. at 346-47 (citing Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir. 1985); Archer v. Dutcher, 733 F.2d 14 (2d Cir. 1984); Robinson v. Moreland, 655 F.2d 887, 889-90 (8th Cir. 1981); Todaro v. Ward, 565 F.2d 48, 53 (2d Cir. 1977). Defendants argue Plaintiff can establish neither the objective nor the subjective requirements of deliberate indifference. They argue that "the foreign body in his thumb was not obvious, except upon view by an x-ray," and the care he received was "prompt and adequate." (Defs.' Br. at 19, 20.) The Court disagrees and concludes Plaintiff has established a triable issue regarding his Eighth Amendment claims.

Plaintiff has provided evidence of an objectively serious medical need. His medical records demonstrate that his thumb was swollen and infected, and he has alleged that the injury caused him significant pain. Though the piece of metal itself could not be seen without an x-ray, the fact that Plaintiff's thumb was swollen and infected should have been apparent and indicative of a problem requiring medical attention. Defendant Patel asserts that x-rays were ordered on March 8, 2005 when Plaintiff complained of pain in his thumb, however, no x-rays were taken until at least March 28, 2005, a month after the accident. (Patel Aff. ¶ 5B.) The record is not clear as to when Plaintiff's thumb first became infected; Defendant Elias knew it was infected at least by April 12, 2005, when he prescribed an antibiotic. (Compl. ¶ 19; Pl.'s Ex. 7.) Plaintiff has alleged that his thumb was grossly swollen and oozing by March 4, 2005. (Compl. ¶ 8.) The facts, viewed in the light most favorable to Plaintiff, demonstrate an obvious medical need requiring further attention.

Plaintiff has additionally shown evidence of subjective deliberate indifference. If Plaintiff's claim was confined to only whether an x-ray was required on the day he was injured,

7

the claim would fail.  The Supreme Court has made clear that "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice. . . ."  Estelle, 429 U.S. at 107.  However, Plaintiff has averred conduct on the part of Defendants beyond merely deciding not to order the x-ray.   According to Plaintiff, he told the medical staff, both when he was first injured and on later visits to the medical department, that metal remained in his thumb.  Plaintiff alleges that when he told medical personnel about the injury and the metal remaining in his hand, they responded with statements evidencing indifference to his plight.  Defendant De Cardi allegedly told Plaintiff the day of the accident, when he told her about the metal, "You're not a doctor, I am, nothing is wrong with you."  (Compl. ¶ 2.)  Defendant Esposito allegedly told Plaintiff he was "faking" on March 4 when Plaintiff returned to the medical department because his thumb was swollen and oozing between the sutures.  (Compl. ¶ 8, 9.)  Defendant Esposito allegedly expressed the same viewpoint during Plaintiff's visit on March 13.  (Compl. ¶ 11.)  On April 1, after the metal had been discovered, Plaintiff asked Defendant Esposito how long he would have to wait before surgery, and Defendant Esposito told him he didn't care.  (Compl. ¶ 17.)

      The medical reports reveal that Plaintiff's thumb was indeed infected, and when the metal was finally discovered surgery was recommended to be scheduled as soon as possible.  (Pl.'s Ex. 3-7.)  However, this surgery was not actually performed until over a month later.  The record is not at all clear on the cause of the delay.  See Durmer v. O'Carroll, 991 F.2d 64, 68-69 (3d Cir. 1993) ("if the inadequate care was a result of an error in medical judgment on [the doctor's] part,

[Plaintiff's] claim must fail; but, if the failure to provide adequate care in the form of physical therapy was deliberate, and motivated by non-medical factors, then [Plaintiff] has a viable claim").

Plaintiff has alleged sufficient facts to establish deliberate indifference to a serious medical need on the part of Defendants DeCardi, Elias, Esposito, Patel, and Sulayman. The right to be free from such deliberate indifference is clearly established in the context of provision of medical care to prisoners. Therefore, Plaintiff's Eighth Amendment claims as to Defendants DeCardi, Elias, Esposito, Patel, and Sulayman will survive. Plaintiff has provided no direct participation in these violations by any other defendants, and all other defendants are granted summary judgment on the Eighth Amendment claims.

Separately, Plaintiff requests Defendant Patel reimburse the government for the costs associated with Plaintiff's trip on April 27, 2005 to the wrong hospital. There is no evidence that this was further deliberate indifference to Plaintiff's medical needs. It seems to have been a mistake, which is not sufficient to state a constitutional violation under the Eighth Amendment. Summary judgment is granted to Defendants on this claim.

    B.    <u>Retaliation</u>

Plaintiff claims Defendants Hamel, Schaaf, and Ferretti retaliated against him for filing administrative grievances and complaining about his injury. To prove a claim of retaliation, a prisoner must demonstrate (1) constitutionally protected conduct, (2) an adverse action by prison officials 'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights,' and (3) 'a causal link between the exercise of his constitutional rights and the adverse action taken against him.'" <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003) (quoting <u>Rauser</u>

v. Horn, 241 F.3d 330, 333 (3rd Cir. 2001)). If a plaintiff satisfies these factors, "the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334.

  Plaintiff has alleged five separate instances of retaliation. The first occurred on April 4, 2005. Plaintiff had left his chair in the television room the night before; when he went to reclaim it, Defendant Hamel told Plaintiff to perform twenty hours of extra duty work before he could have his chair back. Plaintiff alleges this was retaliatory and inappropriate given his medical status. The second set of allegations of retaliation relate to when Plaintiff attempted to file several administrative grievance forms with Defendants Patel, Hamel, and Schaaf. Plaintiff alleges that Defendants Patel, Hamel, and Schaaff threatened him and refused to sign or answer his forms, obstructing his use of the administrative remedy process. The third alleged instance of retaliation occurred at a program review meeting with Defendants Hamel, Schaaff, and Ferretti on April 15, 2005. Plaintiff alleges that after he explained the situation with his infected thumb, Defendant Ferretti began screaming at and threatening him, and Defendant Schaaff did not attempt to stop Defendant Ferretti from engaging in this conduct. The fourth alleged retaliatory action involves Defendant Hamel's conduct in placing Plaintiff on "refused" status for the purposes of the Financial Responsibility Program, thus costing Plaintiff his job with Federal Prisons Industries. The fifth involves an incident report Plaintiff alleges was falsified in retaliation for his speech at a town hall meeting.

  Summary judgment will be granted to Defendants on the first allegation of retaliation. Plaintiff has not identified a specific protected action for which he claims the extra duty work

was retaliation and therefore has not properly made out a constitutional violation.  Even if the Court could discern what protected conduct Plaintiff alleges prompted this action by Defendants, Defendants have clearly provided reasons demonstrating a legitimate penological interest.  Defendant Hamel provided an affidavit indicated that he "routinely offered inmates the opportunity to obtain their confiscated chairs in exchange for performing extra duty," "did not single out" Plaintiff, and "believed that such an arrangement helped promote the legitimate penological interests of respect for rules and responsibility."  (Hamel Aff. 3.)  Plaintiff has not shown that Defendant Hamel's actions were retaliatory or not reasonably related to a legitimate penological interest, and summary judgment is granted to Defendants on this claim.

On the second set of retaliation claims, Defendants will be granted summary judgment for some events and denied summary judgment for others.  Plaintiff filed administrative grievances beginning on April 6, 2005, based on the baseboard-cleaning incident with Defendant Hamel.  For these grievances, there is no evidence of adverse action taken as a result.  Though Plaintiff recites the various problems he encountered in his interactions with Defendants Hamel and Schaaff related to these grievances, there is no evidence that any of Plaintiff's grievances went unanswered or that he was prevented from filing any grievances he wished heard.  Plaintiff must provide evidence of an adverse action sufficient to deter a prisoner of ordinary firmness from exercising his First Amendment rights.  Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).  Taking the facts in the light most favorable to Plaintiff, some of his grievances had to be taken to several different corrections officers to be filed, and some were answered late by various Defendants.  (Compl. ¶ 40-44; Pl.'s Resp. to Hamel Aff. ¶ 19.)  Plaintiff has provided no evidence that the mere fact of the delay constituted an adverse action.  On these claims,

Defendants are granted summary judgment.

However, Plaintiff has provided enough facts to establish a triable claim of retaliation for the events surrounding an administrative grievance filed against the medical staff on April 20, 2005.  Plaintiff provides evidence that after learning of this grievance, on May 13, 2005 Defendant Patel threatened to have Plaintiff transferred or placed in segregation if Plaintiff would not withdraw his complaints.  (Compl. ¶ 52; Pl.'s Opp'n to Patel Aff. ¶ 4.)   Plaintiff went to Defendant Hamel to discuss the incident on May 16, 2005, and Defendant Hamel said, "Don't throw stones if you live in a glass house," and "You'll find out when you end up in the SHU."  (Compl. ¶ 54-55; Pl.'s Opp'n to Hamel Aff. ¶ On May 19, 2005, Plaintiff attempted to discuss the grievance with Defendant Schaaff, who said, "I am tired of you filing these frivolous BP-9s and I will do something about this," and "You inmates don't have rights."  These statements would be sufficient to deter a person of ordinary firmness from the exercise of First Amendment rights, and they are causally linked to Plaintiff's protected conduct.  Moreover, these three defendants cannot establish that they would have made such statements "absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Rauser, 241 F.3d at 333.  There is evidence from which a reasonable jury could conclude that Defendants Patel, Hamel, and Schaaff threatened Plaintiff with penalties for exercising his rights, and summary judgment will be denied on this claim.  See id. at 334 (evidence that officials warned prisoner that constitutional challenges would result in denial of parole created claim of actionable retaliation); Allah, 229 F.3d at 225-26 (retaliatory placement in segregation could deter prisoner of ordinary firmness from exercise of constitutional rights).  There is no evidence that any other Defendants were involved in this conduct, and summary judgment is granted to all other

12

Defendants on this claim.

Plaintiff did not exhaust his administrative remedies on the third alleged instance of retaliation, and Defendants will be granted summary judgment on this claim. A prisoner cannot contest conditions related to his confinement in a federal correctional facility until exhausting "all avenues of relief available to them within their prison's inmate grievance system." Spruill v. Gillis, 372 F.3d 218, 227 (3d Cir. 2004) (holding that the failure to "properly" exhaust administrative remedies under the PLRA constitutes a procedural default). Plaintiff properly utilized the Bureau of Prisons administrative remedy program for most of his claims. However, Defendants provide a declaration from Tara Moran, a legal assistant at FCI-Fort Dix. (Moran Aff.) Moran asserts that as part of her job, she works with a computerized system designed to track inmate grievances. (Moran Aff. ¶ 1.) She further indicates that Plaintiff did not file any grievances seeking administrative remedies related to the program review meeting on April 15, 2005. (Moran Aff. ¶ 5.) Plaintiff disputes Ms. Moran's conclusion, arguing that the document provided is only a "generalized" summary and fails to show enough detail about the grievances. (Pl.'s Resp. to Moran Aff. ¶ 5.) However, Plaintiff's administrative grievance record does provide information about the types of grievances he filed.[1] Because the event in question occurred on April 15, 2005, an administrative grievance would have to have been filed within 20 days of that date or within any extension permitted. See 28 C.F.R. § 542.14. The evidence

---

[1] On April 26, 2005, Plaintiff filed a grievance regarding extra duty incident with Defendant Hamel. On April 27, Plaintiff filed a grievance about his thumb injury. On April 28, he requested a copy of his medical records and x-rays. On May 23, he again complained about the extra duty. On June 3, he made a "staff complaint." On June 6, he complained about being taken to the wrong hospital. On June 20, he complained again about his thumb injury. The record shows he continued filing grievances and appeals of previous grievances. There is also evidence of a grievance filed on April 6, 2005.

provided shows that he did not file a grievance concerning this event within this time frame. Defendants will be granted summary judgment on this claim as well.

On the fourth instance of alleged retaliation, relating to Plaintiff's status in the Financial Responsibility Program, Defendants will be denied summary judgment. Plaintiff's participation in the program meant that on the 10th of each month, a payment of $40 was withdrawn from his account. Plaintiff has provided evidence that he engaged in protected conduct by complaining about his thumb injury and filing grievances during this time. He has also alleged an adverse action in the loss of his prison industries job, which occurred on April 8, 2005, after he filed a grievance against Defendant Hamel on April 6, 2005. (Hamel Aff. ¶ 9; Pl.'s Resp. to Hamel Aff. Ex. 3, 7.) The temporal factor provides evidence of a causal connection between Plaintiff's conduct and the adverse action.

Defendants argue that a legitimate penological interest supported placing Plaintiff into "refuse" status, because every inmate without sufficient funds in his account would be placed in "refuse" status and would lose a prison industries job. (Statement of Facts ¶ 31-34; Defs.' Br. 14.) Plaintiff's records show that he was in "refuse" status from March 21, 2005 to April 18, 2005, and again from June 15, 2005 to July 26, 2005. (Hamel Aff. Ex. 3.) On March 21 and on April 10 (the next payment date), Plaintiff had enough money in his account to cover his Financial Responsibility Program payment, but no payment was withdrawn. (Hamel Aff. Ex. 1.) Defendant's proffered legitimate penological reason is belied by the fact that at the time he was placed in "refused" status, Plaintiff had enough funds in his account to cover the required payments.

Plaintiff has set forth sufficient evidence to make out a constitutional violation against

Defendant Hamel on this claim. However, there is no evidence that any other defendant was involved in the change of Plaintiff's status and the subsequent loss of his job. Though Plaintiff appears to allege that Defendant Lawhorn was involved in these events, there is no evidence of that defendant's participation. (Hamel Aff. ¶ 9; Lawhorn Aff. ¶ 6.) The rest of the Defendants are granted summary judgment on this claim.[2]

Defendants will be granted summary judgment on Plaintiff's fifth and final retaliation claim, arising from an incident report issued on December 8, 2005 for an improperly made bed; Plaintiff claims this incident report was fabricated in retaliation for his speech at a recent town hall meeting. (Pl.'s Resp. to Hamel Aff. ¶ 15-16.) This claim does not rise to the level of actionable retaliation. The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights. See Freeman v. Rideout, 808 F. 2d 949, 952-53 (2d Cir. 1986) (holding that "the mere filing of [a false] charge itself" does not constitute a cognizable claim under § 1983 so long as the inmate "was granted a hearing, and had the opportunity to rebut the unfounded or false charges"), cert. denied, 485 U.S. 982 (1988). See also Duncan v. Neas, No. 86-109, 1988 WL 91571, at *1 (D.N.J. Aug. 30, 1988) (determining that "the alleged knowing falsity of the charge [does not state] a claim of deprivation of a constitutionally protected liberty interest ... where procedural due process protections were provided"). Plaintiff was provided with due process protections before the incident report was issued. There was a hearing, at which he presented two witnesses. Though Plaintiff would have liked to call more witnesses,

---

[2]Plaintiff also appears to claim that Defendant Lawhorn denied him lost-time wages during the period of time he was prevented from working because of his thumb injury. (Compl. ¶ 75-79.) Defendants do not address this claim in their brief, and consequently the Court does not reach any conclusions with regard to this issue.

there is evidence that he was not actually entitled under the institutional rules to call any witnesses at this type of hearing. (Amended Compl. Ex. 5.) Moreover, while Plaintiff claims that it was inappropriate for Defendant Lewis to participate in the institutional proceedings on this claim, Defendant Lewis was not the reporting officer, investigating officer, or a witness to the incident that gave rise to the incident report and was not barred from participating. (Amended Compl. Ex. 5.) There is no evidence that Plaintiff was denied procedural due process regarding this incident report, nor is there any evidence beyond Plaintiff's allegations that this incident report was connected with Plaintiff's speech at the town hall meeting. Defendants are granted summary judgment on this claim.

    C.    <u>Conspiracy to Violate Civil Rights</u>

Plaintiff alleges, in the Amended Complaint, that Defendants Williams, Hamel, Sanford, Robinson, and Lewis conspired with each other to retaliate against Plaintiff in violation of his First Amendment rights based on the events surrounding the allegedly falsified incident report. Defendants contend that Plaintiff has not set forth sufficient facts to make out a claim under 42 U.S.C. § 1985(3). Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To prove a conspiracy to violate a plaintiff's civil rights in violation of § 1985(3), he must prove the existence of (1) a conspiracy motivated by invidious discriminatory animus, (2) for the purpose of depriving him, either directly or indirectly, of the equal protection of the laws, (3) that there was an act in furtherance of the conspiracy, and (4) that he was, as a result, injured in his person or deprived of any right or privilege of a citizen of

the United States.  See Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006).

Plaintiff's conspiracy claim fails because the Court has already determined that none of the events about which Plaintiff alleges a conspiracy, such as the allegedly falsified incident report and the resulting disciplinary hearing, amounted to a deprivation of a federal right. Summary judgment is granted to Defendants on this claim.

## IV.   CONCLUSION

Defendants DeCardi, Elias, Esposito, Patel, and Sulayman are denied summary judgment on Plaintiff's Eighth Amendment claims, with the exception of the claim regarding the trip to the wrong hospital, on which summary judgment is granted.  Defendant Hamel is denied summary judgment on Plaintiff's First Amendment retaliation claim regarding his placement in the Financial Responsibility Program, and Defendants Patel, Hamel, and Schaaff are denied summary judgment on Plaintiff's First Amendment retaliation claim related to the events surrounding the filing of grievance claims against the medical staff.  To the extent Plaintiff claims improper denial of wages after his work-related injury, the Court expresses no opinion on that claim at this time.  Summary judgment is granted to Defendants DeCardi, Elias, Esposito, Patel, Sulayman, Schaaff, and Hamel on all other claims, and summary judgment is granted to Defendants Nash, Ferretti, Lewis, Robinson, Williams, and Sanford on all claims.  An accompanying order will issue today.


Dated:   6-2-08                                              /s/ Robert B. Kugler
                                                                                                                                  ROBERT B. KUGLER
                                                                                                                                  United States District Judge